**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| XIYA QIAN, Individually and On Behalf of All Others Similarly Situated, | ) ) ) **Case No.** |
| Plaintiff, | ) ) ) |
| v. | ) **CLASS ACTION COMPLAINT** ) |
| UBIQUITI NETWORKS, INC., ROBERT J. PERA, KEVIN RADIGAN, CRAIG L. FOSTER and MARK SPRAGG, | ) **JURY TRIAL DEMANDED** ) ) ) |
| Defendants. | ) ) |

**CLASS ACTION COMPLAINT**

Plaintiff Xiya Qian ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ubiquiti Networks, Inc. ("Ubiquiti" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Ubiquiti securities between

1

May 9, 2013 and February 16, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Ubiquiti purports to offer a broad and expanding portfolio of wireless networking products and solutions. The Company's products and solutions, include high performance radios, antennas and management tools that have been designed to deliver carrier class performance for wireless networking and other applications in the unlicensed radio frequency, or RF, spectrum.

3.      The Company does not employ a traditional sales force. Instead, it purports to "drive[] brand awareness largely through the company's user community where customers can interface directly with R&D, marketing, and support." The Company calls this user community the "Ubiquiti Community."   In September 2017, Citron Research raised questions concerning, *inter alia*, the actual number of members in the Ubiquiti Community and the propriety of Ubiquiti's account practices.   In response to the Citron Research report, Ubiquiti's Chief Executive Officer ("CEO"), Defendant Robert J. Pera ("Pera"), defended the Company's business practices, thereby blunting the report's impact on the Company's share price.

4.      Founded in 2003, the Company is headquartered in New York, New York. Ubiquiti's stock trades on the NASDAQ Global Select market ("NASDAQ") under the ticker symbol "UBNT."

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Ubiquiti had overstated the numbers of members of its purported user community; (ii) Ubiquiti had

exaggerated its publicly reported accounts receivable; (iii) the foregoing conduct, when it came to light, would foreseeably result in increased regulatory oversight; and (iv) as a result of the foregoing, Ubiquiti's publicly disseminated financial statements were materially false and misleading.

6.      On February 20, 2018, Ubiquiti issued a Current Report, filed on Form 8-K with the SEC, revealing that the Company had received subpoenas from the Securities and Exchange Commission "requesting documents and information relating to a range of topics including metrics relating to the Ubiquiti Community, accounting practices, financial information, auditors, international trade practices, and relationships with distributors and various other third parties."

7.      On the news of the SEC subpoenas, Ubiquiti's share price fell $18.76, or 25.34%, to close at $55.28 on February 20, 2018, damaging investors.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

11.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Ubiquiti's principal executive offices are located within this Judicial District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff, as set forth in the attached Certification, acquired Ubiquiti securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant Ubiquiti is incorporated in Delaware, with principal executive offices located at 685 Third Avenue, 27th Floor, New York, New York 10017.  Ubiquiti's shares trade on the NASDAQ under the ticker symbol "UBNT."

15.     Defendant Pera has served at all relevant times as the Company's Chairman and CEO.

16.     Defendant Craig L. Foster ("Foster") served as the Company's Chief Financial Officer ("CFO") from March 4, 2013 to April 21, 2015.

17.     Defendant Mark Spragg ("Spragg") served as the Interim Chief Accounting Officer from August 4, 2015 to May 3, 2016.

18.     Defendant Kevin Radigan ("Radigan") has served as the Company's Chief Accounting Officer and Principal Financial Officer since May 3, 2016.

19.     The Defendants referenced above in ¶¶ 15-18 are sometimes referred to herein as the "Individual Defendants."

20.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports,

quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, i.e., the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions within the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

21.     Ubiquiti Networks Inc. offers a broad and expanding portfolio of wireless networking products and solutions. The Company's products and solutions, include high performance radios, antennas and management tools that have been designed to deliver carrier class performance for wireless networking and other applications in the unlicensed radio frequency, or RF, spectrum.

22.     Ubiquiti does not employ a traditional sales force. Instead, it purports to "drive[] brand awareness largely through the company's user community where customers can interface directly with R&D, marketing, and support." The Company calls this user community the "Ubiquiti Community."

### Materially False and Misleading Statements Issued During the Class Period

I.     **Ubiquiti's Reported Receivables Do Not Comport With its Customers' Reported Payables.**

23.     The Class Period begins on May 9, 2013 when Ubiquiti filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2013.  Among other things, the Company's May 9, 2013 Form 10-Q disclosed an accounts receivable balance as of June 30, 2012 of $75.6 million:

### UBIQUITI NETWORKS, INC.
#### Condensed Consolidated Balance Sheets
#### (In thousands, except share data)
#### (Unaudited)

|  | March 31, 2013 | June 30, 2012 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $      181,689 | $      122,060 |
| Accounts receivable, net of allowance for doubtful accounts of $2,700 and $1,266, respectively | 38,417 | 75,644 |
| Inventories | 19,381 | 7,734 |
| Current deferred tax asset | 882 | 882 |
| Prepaid expenses and other current assets | 3,269 | 1,577 |
| Total current assets | 243,638 | 207,897 |
| Property and equipment, net | 6,178 | 4,471 |
| Long-term deferred tax asset | 232 | 232 |
| Other long–term assets | 1,775 | 1,136 |
| Total assets | $      251,823 | $      213,736 |

24.     The Company's May 9, 2013 Form 10-Q also alluded to customers with receivables over 10 percent of its total outstanding receivables. In particular, Ubiquiti reported that a company it called "Customer D" accounted for 12 percent of its reported $75.6 million in receivables as of June 30, 2012, meaning that Customer D's share of the receivable was $9.072 million.

| | Percentage of Revenues | | | | Percentage of Accounts Receivable | |
|---|---|---|---|---|---|---|
| | Three Months Ended March 31, | | Nine Months Ended March 31, | | March 31, | June 30, |
| | 2013 | 2012 | 2013 | 2012 | 2013 | 2012 |
| Customer A | 15% | 20% | 13% | 19% | 13% | 19% |
| Customer B | * | 10% | * | * | 10% | * |
| Customer C | * | * | * | 10% | 13% | 11% |
| Customer D | * | * | * | * | * | 12% |

*\* denotes less than 10%*

25.     The Company's May 9, 2013 Form 10-Q contained certifications pursuant to the

Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Pera and Foster, who certified that:

1. I have reviewed this Quarterly Report on Form 10-Q of Ubiquiti Networks, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) [paragraph omitted in accordance with Exchange Act Rule 13a-14(a)];

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's

auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

26.     On September 13, 2013, Ubiquiti filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended June 30, 2013 (the "2013 10-K").  It once again disclosed an accounts receivable balance as of June 30, 2012 of $75.6 million:

### UBIQUITI NETWORKS, INC.
#### Consolidated Balance Sheets
#### (In thousands, except share data)

| | June 30, | |
|---|---|---|
| | 2013 | 2012 |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 227,826 | $ 122,060 |
| Accounts receivable, net of allowance for doubtful accounts of $2,200 and $1,266, respectively | 35,884 | 75,644 |
| Inventories | 15,880 | 7,734 |
| Current deferred tax asset | 733 | 882 |
| Prepaid expenses and other current assets | 3,151 | 1,577 |
| Total current assets | 283,474 | 207,897 |
| Property and equipment, net | 5,976 | 4,471 |
| Long-term deferred tax asset | 4 | 232 |
| Other long–term assets | 2,886 | 1,136 |
| Total assets | $ 292,340 | $ 213,736 |

27.     The 2013 10-K once again identified customers with account balances greater than 10 percent of total accounts receivable. But, in a change from the May 9, 2013 Form 10-Q, it identified such customers by name, on the chart reproduced below:

| Percentage of Revenues | Percentage of Accounts Receivable |
|---|---|

| | Years Ended June 30, | | | June 30, | |
|---|---|---|---|---|---|
| | **2013** | **2012** | **2011** | **2013** | **2012** |
| Flytec Computers, Inc. | 13% | 16% | 20% | 12% | 19% |
| P.W. Batna Magdalena Mucha | * | * | * | 11% | * |
| Streakwave Wireless, Inc. | * | 10% | 15% | 15% | 11% |
| Discomp | * | * | * | * | 12% |

*\* denotes less than 10%*

28.    Accordingly, the customer with 12 percent of the accounts receivables as of June 30, 2012 – previously referred to as "Customer D" – was actually called Discomp.

29.    The Company's September 13, 2013 Form 10-K contained certifications pursuant to SOX, signed by Defendants Pera and Foster, who certified that:

1. I have reviewed this annual report on Form 10-K of Ubiquiti Networks, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

30.     According to its web site, www.discomp.eu, Discomp is a vendor of computer networking equipment in the Czech Republic.

31.     According to another prominent market research analyst, Discomp only reported a total "trade payable" of approximately $3.43 million as of June 30, 2012 to the Czech Republic's Public Registry and Collection of Documents within the Ministry of Justice.

32.     The $9.072 million receivable that Ubiquiti reported is inconsistent with the total $3.43 million that Discomp reported.

33.     Moreover, the large discrepancy between Ubiquiti's report of the Discomp, née Customer D, receivable, and Discomp's report of its own "trade payable" was not an isolated occurrence.

34.     On August 21, 2015, Ubiquiti filed an annual report on Form 10-K with the SEC,

announcing the Company's financial and operating results for the quarter and fiscal year ended

June 30, 2015 (the "2015 10-K"), reporting, among other things, a total of $66.1 million in

receivable as of that day:

### UBIQUITI NETWORKS, INC.
#### Consolidated Balance Sheets
#### (In thousands, except share data)

| | June 30, | |
| --- | --- | --- |
| | 2015 | 2014 |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $    446,401 | $    347,097 |
| Accounts receivable, net of allowance for doubtful accounts of $1,071 and $1,395, respectively | 66,104 | 54,871 |
| Inventories | 37,031 | 46,349 |
| Current deferred tax assets | 1,535 | 884 |
| Prepaid income taxes | 2,566 | 3,256 |
| Prepaid expenses and other current assets | 27,709 | 13,267 |
| Total current assets | 581,346 | 465,724 |
| Property and equipment, net | 15,602 | 7,260 |
| Long-term deferred tax assets | 1,515 | 1,255 |
| Other long–term assets | 2,109 | 1,912 |
| Total assets | $    600,572 | $    476,151 |

35.     Ubiquiti once again disclosed customers with receivables greater than 10 percent

of the total. In the chart below, it disclosed that a customer called P.W. Batna Magdalena Mucha

("Batna") accounted for 12 percent of the receivables as of that date – meaning that Batna's

share was $7.93 million.

| | Percentage of Revenues | | | Percentage of Accounts Receivable | |
| --- | --- | --- | --- | --- | --- |
| | Years Ended June 30, | | | June 30, | |
| | 2015 | 2014 | 2013 | 2015 | 2014 |
| Flytec Computers, Inc. | * | 13% | 13% | * | 13% |
| Streakwave Wireless, Inc. | * | * | * | 13% | 12% |
| P.W. Batna Magdalena Mucha | * | * | * | 12% | 12% |
| *  denotes less than 10% | | | | | |

36.     The Company's August 21, 2015 Form 10-K contained certifications pursuant to SOX signed by Defendants Pera and Spragg, the interim Chief Accounting Officer, substantially similar to the certifications described in ¶¶31and 35, *supra*.

37.     On  February 4, 2016, Ubiquiti filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended December 31, 2015, disclosing, among other things, that it had accounts receivable of $64.6 million as of December 31, 2015 and it reiterated the $66.1 million receivable figure as of June 30, 2015 in a separate column:

**UBIQUITI NETWORKS, INC.**
**Condensed Consolidated Balance Sheets**
**(In thousands, except share data)**
**(Unaudited)**

| | December 31, 2015 | June 30, 2015 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 496,672 | $ 446,401 |
| Accounts receivable, net of allowance for doubtful accounts of $1,244 and $1,071 at December 31, 2015 and June 30, 2015 respectively | 64,568 | 66,104 |
| Inventories | 33,105 | 37,031 |
| Vendor deposits | 15,620 | 19,998 |
| Current deferred tax asset | 1,535 | 1,535 |
| Prepaid income taxes | — | 2,566 |
| Prepaid expenses and other current assets | 8,440 | 7,711 |
| Total current assets | 619,940 | 581,346 |
| Property and equipment, net | 13,359 | 15,602 |
| Long-term deferred tax asset | 1,538 | 1,515 |
| Other long-term assets | 1,918 | 2,109 |
| Total assets | $ 636,755 | $ 600,572 |

38.     In the Company's February 4, 2016 10-Q, Ubiquiti stopped reporting the names of customers with receivables greater than 10 percent of the total receivable. Instead, Ubiquiti employed pseudonyms. Specifically, Ubiquiti identified "Customer C" as accounting for 12

percent of the June 30, 2015 account receivable, or $7.9 million, and 14 percent of the December 31, 2015 receivable:

| | Percentage of Revenues | | | | Percentage of Accounts Receivable | |
|---|---|---|---|---|---|---|
| | Three Months Ended December 31, | | Six Months Ended December 31, | | December 31, | June 30, |
| | 2015 | 2014 | 2015 | 2014 | 2015 | 2015 |
| Customer A | 13% | 12% | 11% | 11% | * | * |
| Customer B | * | 13% | * | 11% | * | 13% |
| Customer C | * | * | * | * | 14% | 12% |
| Customer D | * | * | * | * | 15% | * |

*denotes less than 10%*

39.    Because Batna represented 12% of accounts receivable as of June 30, 2015, it follows that Batna is "Customer C."

40.    Ubiquiti further reported in its February 4, 2016 Form 10-Q that the total accounts receivable as of December 31, 2015 were $64.6 million:

### UBIQUITI NETWORKS, INC.
#### Condensed Consolidated Balance Sheets
#### (In thousands, except share data)
#### (Unaudited)

| | December 31, 2015 | June 30, 2015 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $      496,672 | $      446,401 |
| Accounts receivable, net of allowance for doubtful accounts of $1,244 and $1,071 at December 31, 2015 and June 30, 2015 respectively | 64,568 | 66,104 |
| Inventories | 33,105 | 37,031 |
| Vendor deposits | 15,620 | 19,998 |
| Current deferred tax asset | 1,535 | 1,535 |
| Prepaid income taxes | — | 2,566 |
| Prepaid expenses and other current assets | 8,440 | 7,711 |
| Total current assets | 619,940 | 581,346 |
| Property and equipment, net | 13,359 | 15,602 |
| Long-term deferred tax asset | 1,538 | 1,515 |
| Other long-term assets | 1,918 | 2,109 |
| Total assets | $      636,755 | $      600,572 |

13

41.     The 14 percent of the $64.6 million receivable due to Batna was accordingly $9.04 million.

42.     The Company's February 4, 2016 Form 10-Q contained certifications pursuant to SOX signed by Defendants Pera and Spragg, substantially similar to the certifications described in ¶¶31 and 35, *supra*.

43.     According to its web site, https://www.anteny24.com/, Batna is headquartered in the Polish city of Czestochowa. It also sells computer networking equipment.

44.     According to Batna's audited financial statements, it had total "Trade Payables" of $2.746 million as of December 31, 2015. This figure is far at odds with the more than $9 million in receivables claimed by Ubiquiti in its February 4, 2016 Form 10-Q.

45.     Once again, Ubiquiti's statements about its reported customers' outstanding receivables are inconsistent with the customers' own statements.

## II.     Ubiquiti Has Inflated the Number of People in the "Ubiquiti Community."

46.     The Company's February 20, 2018 announcement revealed that "metrics relating to the Ubiquiti Community" is an area of focus for the SEC. The Ubiquiti Community is, in the Company's words in its most recent Form 10-Q filed on February 8, 2018, "a large, growing and highly engaged community of consumers, service providers, distributors, value added resellers, systems integrators and corporate IT professionals."

47.     The February 8, 2018 Form 10-Q stated that the Ubiquiti Community is an "important element of our business strategy as it enables us to drive: Rapid customer and community driven product development … Scalable sales and marketing model … [and] Self-sustaining product support."

48.     A large Ubiquiti Community is significant for Ubiquiti because the Company lacks a traditional sales force, instead relying on its purported connection to this rabid user community to drive demand for its products.

49.     Essentially, Ubiquiti claims to have outsourced substantial elements of its product development, sales and marketing, and product support functions to its own customers – supposedly at substantial cost savings.

50.     The Ubiquiti Community is central to Ubiquiti's strategy. For example, in the August 25, 2017 10-K, Ubiquiti said that its "business model is driven by a large, growing and highly engaged community of service providers, distributors, value added resellers, systems integrators and corporate IT professionals, which we refer to as the Ubiquiti Community. The Ubiquiti Community is a critical element of our business strategy as it enables us to drive: rapid customer and community driven product development … Scalable sales and marketing model … Self-sustaining product support."

51.     Ubiquiti has repeatedly overstated the size of its Ubiquiti Community.

52.     On February 9, 2017, Ubiquiti announced its second quarter 2017 financial results in a press release that stated that Ubiquiti's "growth is supported by the Ubiquiti Community, a global grass-roots community of 4 million entrepreneurial operators and systems integrators who engage in thousands of forums." The press release was filed that day as an exhibit to a form 8-K signed by Pera.

53.     This same statement was repeated on May 4, 2017, when Ubiquiti announced its third quarter 2017 financial results in a press release filed that day as an exhibit to the Company's Form 8-K filed with the SEC. 58. Ubiquiti repeated the statement again on August 3,

2017, when it announced its preliminary fourth quarter 2017 financial results in a press release filed that day as an exhibit to the Company's Form 8-K filing with the SEC.

54.     On August 25, 2017 Ubiquiti filed a form 10-K signed by Pera and Radigan which contained SOX certifications, signed by Pera and Radigan, substantially similar to the certifications described in ¶¶31 and 35, *supra*. That 10-K increased the size of the Ubiquiti community, describing it as "a global, grass-roots community of over 4 million entrepreneurial operators and systems integrators who engage in thousands of on-line forums."

55.     Ubiquiti also disseminated an "investor presentation" on February 21, 2017 claiming that the "Ubiquiti Community" contained "4 million registered users." The presentation was an exhibit to a form 8-K filed that day, and signed by Defendant Pera.

56.     Ubiquiti repeated the claim on August 10, 2017 in another "investor presentation" filed as an exhibit to a form 8-K filed that day, and signed by Defendant Pera. In fact, the Ubiquiti Community had nowhere close to 4 million users.

57.     In the Citron Report, Citron showed how each registered user was given a unique user ID that appears in the URL (a/k/a web address) of their profile page. For example, a user who registered in June 2017 received the user ID 643002, which tied to a web page at https://community.ubnt.com/t5/user/viewprofilepage/user-id/643002.

58.     The Citron Report showed that the user IDs are issued sequentially. A user ID registered in 2007 had user ID 94, and a profile page at https://community.ubnt.com/t5/user/viewprofilepage/user-id/94.

59.     The Citron Report showed that the user IDs ended at about 710,000 – far less than the 4,000,000 users reported. According to Citron, anyone searching for a profile on a user ID higher than 720,000 would see a message that "Person does not exist." (As of the date of this

Complaint, the number has risen: now, User IDs higher than about 862,400 now generate a "Person does not exist" message.)

60.     Ubiquiti Community members can post in online message boards. Yet, Citron also reported that "97% of accounts never post. In an analysis of 11,250 recently registered accounts, 10,910 out of 11,250 (96.97%) never posted a single message on the forum. This is remarkable given that all the forum material is available without registering an account and the only apparent benefit to registering is the ability to post." Indeed, Citron asserted that "The majority of these 700,000 accounts are bots," e.g., "web robots."

61.     Following Citron's exposure, the Company admitted that it had inflated the size of the Ubiquiti Community, due to a purported "reporting error." In a Form 8-K filed November 9, 2017, signed by Defendant Pera, the Company asserted that, in actuality, there were only about 609,000 registered users in the Ubiquiti Community – not the 4 million it repeatedly reported:

> As a result of a reporting error, the previously furnished Prior Investor Presentations and the investor presentation used by Company management dated as of May 2017 referenced 4 million registered users in the Ubiquiti Community, and the Company's Annual Report on Form 10-K for the fiscal year ended June 30, 2017 reported that the Ubiquiti Community included over 4 million entrepreneurial operators and systems integrators. In actuality, as of December 31, 2016, the Ubiquiti Community included approximately 609,000 registered users, while there were approximately 4 million registered user sessions at https://community.ubnt.com during the calendar year ended December 31, 2016. The information on https://community.ubnt.com is not part of this Current Report on Form 8-K.

62.     In an investor call that day, when an analyst asked about the huge reduction in the reported size of the Ubiquiti Community, Pera responded that it "sounds like your shorts are getting nervous." The Company's August 25, 2017 Form 10-K called the Ubiquiti Community a "critical element of our business strategy," Pera soft-pedaled the significance of the Company's prior misstatements, stating: "I don't think that number is really that critical of an observation.

Our IR people mixed up user sessions and total users. But regardless, our user community is more engaged than ever."

The statements referenced in ¶¶ 23-27,29, 34-38, 40, 42, 44, 46-56, and 62 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Ubiquiti had overstated the numbers of members of its purported user community; (ii) Ubiquiti had exaggerated its publicly reported accounts receivable; (iii) the foregoing conduct, when it came to light, would foreseeably result in increased regulatory oversight; and (iv) as a result of the foregoing, Ubiquiti's publicly disseminated financial statements were materially false and misleading.

## The Truth Begins to Emerge

63.     On February 20, 2018, Ubiquiti issued a Current Report, filed on Form 8-K with the SEC, revealing that the Company had received subpoenas from the Securities and Exchange Commission "requesting documents and information relating to a range of topics including metrics relating to the Ubiquiti Community, accounting practices, financial information, auditors, international trade practices, and relationships with distributors and various other third parties."

64.     On this news, Ubiquiti's share price fell $18.76, or 25.34%, to close at $55.28 on February 20, 2018.

65.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

66.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Ubiquiti securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

67.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Ubiquiti securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Ubiquiti or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

68.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

69.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

70.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Ubiquiti;

- whether the Individual Defendants caused Ubiquiti to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Ubiquiti securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

71.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

72.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Ubiquiti securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Ubiquiti securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

73.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

74.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

75.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

76.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

77.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the

other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Ubiquiti securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Ubiquiti securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

78.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Ubiquiti securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Ubiquiti's finances and business prospects.

79.     By virtue of their positions at Ubiquiti , Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants

22

were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

80.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Ubiquiti, the Individual Defendants had knowledge of the details of Ubiquiti's internal affairs.

81.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Ubiquiti.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Ubiquiti's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Ubiquiti securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Ubiquiti's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Ubiquiti securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

82.     During the Class Period, Ubiquiti securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be

23

disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Ubiquiti securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Ubiquiti securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Ubiquiti securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

83.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

84.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

85.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

86.     During the Class Period, the Individual Defendants participated in the operation and management of Ubiquiti, and conducted and participated, directly and indirectly, in the

conduct of Ubiquiti's business affairs.  Because of their senior positions, they knew the adverse non-public information about Ubiquiti's misstatement of income and expenses and false financial statements.

87.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Ubiquiti's financial condition and results of operations, and to correct promptly any public statements issued by Ubiquiti which had become materially false or misleading.

88.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Ubiquiti disseminated in the marketplace during the Class Period concerning Ubiquiti's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Ubiquiti to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Ubiquiti within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Ubiquiti securities.

89.    Each of the Individual Defendants, therefore, acted as a controlling person of Ubiquiti.  By reason of their senior management positions and/or being directors of Ubiquiti, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Ubiquiti to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Ubiquiti and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

90.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Ubiquiti.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  February 28, 2018

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
            ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom

10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
(212) 697-6484
peretz@bgandg.com

*Attorneys for Plaintiff*